COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, AtLee and Senior Judge Clements
Argued at Lexington, Virginia

ROBERT ALLEN HUTTON

                                          OPINION BY
v.       Record No. 0191-16-3          JUDGE RICHARD Y. ATLEE, JR.
                                          NOVEMBER 8, 2016

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SMYTH COUNTY
Deanis L. Simmons, Judge

Brandie I. Lester (Alan & Lester, PLLC, on briefs), for appellant.

Victoria Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

A judge of the Circuit Court of Smyth County ("the trial court") convicted Robert Allen

Hutton of taking indecent liberties with a child.  Hutton now appeals that felony conviction.  He

claims that "the evidence presented at trial was insufficient to establish that [he] maintained the

statutorily required custodial or supervisory relationship over [the] victim."  We agree with

Hutton, and reverse his conviction.

I.

In reviewing a criminal conviction, we view the evidence in the light most favorable to

the Commonwealth.  Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003).

We also draw all reasonable inferences from that evidence.  Id.  Such mandatory deference

requires us to discard Hutton's evidence when it conflicts with that of the Commonwealth.

Wright v. Commonwealth, 196 Va. 132, 137, 82 S.E.2d 603, 606 (1954).

In 2014, B.H. and her family moved in across the street from Hutton, who lived with his

mother.  Beginning in August of that year, and continuing for the next four months, B.H. visited

Hutton's home frequently. During this time, B.H. was fifteen years old and Hutton was thirty-nine. Initially, her visits were with Hutton's mother, but B.H. soon became friendly with Hutton himself. While she was at Hutton's home, B.H. would watch television, talk, and eat food prepared by Hutton (and occasionally by his mother). During some of these visits, Hutton's mother was at work, and B.H. and Hutton were alone. The timing of B.H.'s visits varied: sometimes she visited on weekends, sometimes on weekdays after school, and twice on weekdays when she should have been in school. Some visits occurred while B.H.'s parents were at work, while others took place when her parents were at home across the street. Ultimately, between August and November of 2014, B.H. and Hutton had sex, at Hutton's request, "about five" times.

B.H.'s mother, Rhonda, testified that her daughter visited Hutton's home regularly, although Rhonda believed B.H. was there to visit Hutton's mother. Occasionally, Rhonda would call Hutton's home to request that her daughter return home. In those instances, either Hutton or his mother would answer the phone and relay the message to B.H. Rhonda never took her daughter to Hutton's home, and never asked Hutton to watch or babysit B.H. To the contrary, Rhonda warned B.H. to stay away from Hutton's home, because her daughter "did not need to be hanging out with a grown man." Eventually, Rhonda called and spoke to Hutton, asking why her daughter was at his home so frequently. In response, Hutton explained that he was "just being a mentor to her." Rhonda told Hutton that "he is an adult, she is a child" and that B.H. should not be there.

In November of 2014, Hutton told B.H. that he "wanted his space." She stopped visiting. The matter might have ended there, except that B.H. soon discovered she was pregnant.[1] Following the discovery of B.H.'s pregnancy, her parents found gifts Hutton had given her,

---

[1] At the time of trial, paternity of the child had not been established.

including clothes. B.H.'s father returned these gifts to Hutton, and the two soon began to argue in Hutton's yard. The argument escalated into a physical fight. After the fight was over, Hutton admitted having had sexual intercourse with B.H.

The Commonwealth obtained a warrant charging Hutton with rape. The Juvenile and Domestic Relations District Court of Smyth County certified the charge to the grand jury, which returned a true bill. Before trial, however, the Commonwealth amended the indictment, without objection from Hutton, to allege indecent liberties with a child. Specifically, the amended indictment charged that Hutton:

> On or about August 1, 2014 through December 15, 2014, in the County of Smyth, Virginia, did unlawfully and feloniously take indecent liberties [with] a child under the age of 18 while in a supervisory capacity over said child, the defendant being 18 years of age or older, in violation of Section 18.2-370.1(A), Code of Virginia of 1950, as amended.

At trial, after the Commonwealth rested its case, Hutton moved to strike the evidence, arguing that the Commonwealth had not established the required supervisory relationship between Hutton and B.H. The trial court denied this motion, and Hutton and his mother then testified. Hutton denied having sex with B.H., denied telling her father that he had done so, denied claiming to be her "mentor," and denied giving her any gifts. He conceded that he had a prior misdemeanor conviction for a crime of moral turpitude.

Following closing arguments, the trial court convicted Hutton and sentenced him to five years in the penitentiary, suspending all but the time he had served awaiting trial (two hundred and ninety-four days). The trial court ordered Hutton to register as a sex offender, to complete a sex offender treatment program, and to refrain from any contact with B.H. or her family.

II.

Hutton asserts that "the evidence presented at trial was insufficient to establish that [he] maintained the statutorily required custodial or supervisory relationship over [the] victim."[2] The deferential interpretive lens through which we view the Commonwealth's evidence, coupled with Hutton's prior conviction of a crime of moral turpitude, requires us to reject Hutton's testimony when it contradicts the Commonwealth's evidence. Similarly, we assume that all of the Commonwealth's witnesses testified truthfully. Even viewing the evidence in this manner, we find it insufficient as a matter of law to sustain Hutton's conviction.

A.

When assessing evidentiary sufficiency, we defer to the trial court and reverse only for plain error or when the trial court's decision lacks any evidentiary support. Farhoumand v. Commonwealth, 288 Va. 338, 351, 764 S.E.2d 95, 102 (2014). An appellate court is "not permitted to reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), or "to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion," Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998). As an appellate court, we do not second-guess the trier of fact by

_____

[2] Hutton also assigns error to the trial court's denial of his motion to strike, which he made at the conclusion of the Commonwealth's evidence. However, as the Commonwealth correctly observed in its brief, Hutton waived this assignment of error.

> [W]hen a defendant elects to introduce evidence in his own behalf after the denial of a motion to strike the Commonwealth's evidence, any further challenge to the sufficiency of the evidence at trial or on appeal is to be determined from the entire record, because by putting on additional evidence, the defendant waives his ability to challenge the sufficiency of the Commonwealth's evidence in isolation . . . .

Murillo-Rodriguez v. Commonwealth, 279 Va. 64, 74, 688 S.E.2d 199, 204-05 (2010). For that reason, we do not address this assignment of error.

declaring how we would have decided the case, rather, we determine "after viewing the evidence in the light most favorable to the prosecution, [whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). Finally, we interpret the Code *de novo*. Commonwealth v. Herring, 288 Va. 59, 66, 758 S.E.2d 225, 229 (2014).

B.

Virginia's indecent liberties statute, Code § 18.2-370.1(A), states, in relevant part:

> Any person 18 years of age or older who . . . maintains a custodial or supervisory relationship over a child under the age of 18 . . . who, with lascivious intent, knowingly and intentionally . . . (ii) proposes to such child the performance of an act of sexual intercourse . . . or (vi) sexually abuses the child as defined in subdivision 6 of § 18.2-67.10[3] is guilty of a Class 6 felony.

When a statute uses unambiguous language, we give that language its plain meaning. Bd. of Supervisors of James City Cty. v. Windmill Meadows, LLC, 287 Va. 170, 179-80, 752 S.E.2d 837, 842 (2014). Although Code § 18.2-370.1 is unambiguous, it does not define the word "supervisory," nor does a definition for the term appear elsewhere in Title 18.2. Webster's Third New International Dictionary (2002) defines "supervise" as "coordinate, direct, and inspect continuously and at first hand the accomplishment of" and "oversee with the powers of direction and decision the implementation of one's own or another's intentions." Id. at 2296; see also Supervision, Black's Law Dictionary (10th ed. 2014) (defining it as "[t]he series of acts involved in managing, directing, or overseeing persons or projects").

---

[3] Subdivision 6 of Code § 18.2-67.10 defines "sexual abuse," and includes within the definition "an act committed with the intent to sexually molest, arouse, or gratify any person, where . . . [t]he accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts." Subdivision 2 of that same code section defines "intimate parts" as "the genitalia, anus, groin, breast, or buttocks of any person." When Hutton proposed, and had, intercourse with B.H., his actions implicated both subsection (ii) and (vi) of Code § 18.2-370.1(A).

- 5 -

In several cases over the course of the last two decades, this Court and our Supreme Court have addressed the parameters of the supervisory dynamic implicated by this statute. (In each of the following cases, the deciding Court affirmed the conviction.)

In Krampen v. Commonwealth, 29 Va. App. 163, 510 S.E.2d 276 (1999), the fifteen-year-old victim was alone with Krampen as he drove her home after church. Krampen fondled the victim's breasts, but argued on appeal that "his involvement with the victim 'consisted only of assisting her in transportation from church' and the applicable statute requires 'more than an informal part-time casual relationship.'" Id. at 166, 510 S.E.2d at 277-78. In disagreeing, a panel of this Court held that "the 'custodial or supervisory relationship' required under Code § 18.2-370.1 is not limited to those situations where legal custody exists." Id. at 168, 510 S.E.2d at 278. Because the victim was traveling with Krampen with her mother's permission, "[h]is contact with the victim was in the nature of a baby-sitter, i.e., one entrusted with the care of the child for a limited period." Id. at 168, 510 S.E.2d at 278-79. "As the only adult present during these trips, [Krampen] had the responsibility for and control of the victim's safety and well-being while she was in his care." Id. at 168, 510 S.E.2d at 278.[4]

Guda v. Commonwealth, 42 Va. App. 453, 592 S.E.2d 748 (2004), also involved a fifteen-year-old female victim. Late for class, she requested a hall pass from Guda, a school security officer at her high school. Once Guda was alone with the victim in his office, he sexually abused her. In response to the victim's fearful promise not to tell anyone what Guda had done, he replied "I know; that's why I did it to you." Id. at 456, 592 S.E.2d at 749. Testimony at trial established that as part of his job, Guda "was responsible for the safety and security of the students." Id. On appeal, however, he contended that the evidence of a custodial

_____

[4] An additional factor supporting the adequacy of the relationship was Krampen's concession to the local department of social services that, at the time he transported the victim, "he assumed a custodial or guardianship role over her." Id. at 166, 510 S.E.2d at 277.

or supervisory relationship was insufficient, because such a relationship required entrustment, as in Krampen. A panel of this Court rejected Guda's position, finding that the required relationship "arises when the supervising adult exercises care and control over the child, with the care including the 'responsibility for and the control of the [victim]'s safety and well[-]being.'" Id. at 459, 592 S.E.2d at 751 (quoting Krampen, 29 Va. App. at 168, 510 S.E.2d at 279). Guda's job required him to exercise care and control over students, and he leveraged this control to abuse the victim.

In Sadler v. Commonwealth, 276 Va. 762, 667 S.E.2d 783 (2008), the victim was a seventeen-year-old girl and Sadler the coach of her traveling softball team. He went to her house "knowing she was alone" and sexually abused her. Id. at 764, 667 S.E.2d at 784. While at the victim's house, Sadler also showed her the team's new uniforms. On appeal, he denied that he had a custodial or supervisory relationship over the victim, "because he was not acting as her coach or with her for any team-related reason at the time of the offensive conduct." Id. at 765, 667 S.E.2d at 784. The Supreme Court rejected this interpretation of the statute because it improperly "impose[d] a limitation on the plain meaning of the words used." Id. The Court found Sadler's construction of the statute "inconsistent with the purpose of the statute which is to protect minors from adults who might exploit certain types of relationships." Id. at 765, 667 S.E.2d at 785. Exploitation of this sort "is not limited to incidents occurring during the activity upon which the relationship is based." Id. Sadler used his relationship to facilitate his sexual abuse of the victim. That relationship existed at the time of the abuse, even if, at that time, Sadler was not engaged in an activity directly related to the relationship.

Kolesnikoff v. Commonwealth, 54 Va. App. 396, 679 S.E.2d 559 (2009), concerned a fifteen-year-old boy sexually abused by the father of his friend. The victim and his friend were playing video games at the friend's house when Kolesnikoff told the boys to "go to bed." Id. at

400, 679 S.E.2d at 561. While his own son slept, Kolesnikoff sexually abused the victim. On appeal, Kolesnikoff attacked the sufficiency of the evidence of a supervisory relationship. In affirming, a panel of this Court (referring to the victim as "V." and to Kolesnikoff as "appellant") found that

> a longstanding relationship between appellant and V.'s family existed. V. frequently spent the night at appellant's house and accompanied appellant's family on several vacations. On the night in question, appellant was aware of V.'s presence in the home. He testified that he was concerned about a video game's effect on both boys, intervening as he saw fit. Appellant asserted authority over V. and, likewise, his own son, telling both boys to "go to bed." Appellant acted "in the nature of a baby-sitter, *i.e.*, one entrusted with the care of the child for a limited period of time."

Id. at 404-05, 679 S.E.2d at 563 (second quotation quoting Krampen, 29 Va. App. at 168, 510 S.E.2d at 279).

Most recently, in Linnon v. Commonwealth, 287 Va. 92, 752 S.E.2d 822 (2014), the victim was a sixteen-year-old girl who attended the vocational school where Linnon taught. Although Linnon was not her teacher, he saw the victim daily as he "monitored the sidewalk near the bus loading zone." Id. at 96, 752 S.E.2d at 824. During the school's winter break, the victim visited Linnon's house, at his wife's invitation. There, Linnon sexually abused her. He asserted on appeal that affirming his conviction would mean that "mere employment as a teacher when a minor attends school establishes the relationship necessary for conviction under Code § 18.2-370.1(A)." Id. at 97-98, 752 S.E.2d at 825. In rejecting this argument, the Supreme Court observed that the statute exists "to protect minors from adults who might exploit certain types of relationships." Id. at 98, 752 S.E.2d at 826 (quoting Sadler, 276 Va. at 765, 667 S.E.2d at 785). In Linnon's case,

> [t]he evidence established that [Linnon] was assigned responsibility for student safety and supervision in the cafeteria one day each week and on the sidewalk before, after, and between classes each day. This assignment was beyond the scope of his

regular classroom duties and encompassed students not enrolled in his classes. He therefore had the relationship required by the statute with respect to [the victim] even though she was not his student.

Id. at 99, 752 S.E.2d at 826. The Court found that, although the abuse occurred outside of school, and, indeed, while school was out of session, "school was due to resume in a few weeks and [Linnon] and [the victim] would again see each other there on a daily basis as he performed assigned administrative duties." Id. at 100, 752 S.E.2d at 827. As in Sadler, "[w]hile the required relationship may have been abeyant in the interstice, it did not cease to exist. Rather, it continued, with a known past and an expected, imminent future." Id.

The closest our cases have come to bringing Hutton's relationship with B.H. within the purview of the indecent liberties statute is found in Snow v. Commonwealth, 33 Va. App. 766, 537 S.E.2d 6 (2000). In that case, Snow drove away from a traffic stop, ultimately reaching speeds of 112 miles per hour in his attempt to elude the police officers chasing him. Among Snow's passengers were children aged seventeen, ten, and eight. He was neither the father nor the guardian of these children. Snow was charged with child abuse for endangering the children in the car. The child abuse statute, Code § 18.2-371.1, requires only that the Commonwealth prove a defendant was "responsible for the care of a child," in contrast to the "custodial or supervisory relationship" that Code § 18.2-370.1(A) requires. Applying Krampen's logic to the "less stringent wording of Code § 18.2-371.1," Snow observed that "as a logical extension of our holding in Krampen, we find that one may become a person 'responsible for the care of a child' by a voluntary course of conduct and without explicit parental delegation of supervisory responsibility or court order." Snow, 33 Va. App. at 773, 537 S.E.2d at 10; see also Carrington v. Commonwealth, 59 Va. App. 614, 621, 721 S.E.2d 815, 818 (2012) (quoting Snow's "voluntary course of conduct" formulation in affirming a child abuse conviction). Other panels of this Court have since cited Snow with approval when interpreting the more stringent indecent

- 9 -

liberties statute. See Sadler v. Commonwealth, 51 Va. App. 17, 23-24, 654 S.E.2d 313, 316 (2007), aff'd, 276 Va. 762, 667 S.E.2d 783 (2008); Guda v. Commonwealth, 42 Va. App. 453, 460, 592 S.E.2d 748, 751 (2004).[5]

C.

Hutton's relationship with B.H. was inappropriate, and we do not question the Commonwealth's motivation in seeking a criminal sanction for Hutton's conduct. But this Court does not review whether an appellant committed *some* crime; rather, we review whether an appellant committed that crime of which he stands convicted. Although it is not the aim of this Court "to discover loopholes in order that the guilty may escape their just deserts," Gilland v. Commonwealth, 184 Va. 223, 235, 35 S.E.2d 130, 134 (1945), we are not free to affirm a conviction, even one obtained for behavior that we find reprehensible, unless the statute under which the conviction was obtained clearly prohibits an appellant's conduct.

The Commonwealth asks us to label Hutton's relationship with B.H. "supervisory." However, interpreting Code § 18.2-370.1 as broadly as the Commonwealth urges would all but airbrush the word "supervisory" from the statute. It is a "settled principle of statutory construction that every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." Hubbard v. Henrico Ltd. P'shp, 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998). Finding Hutton's relationship over B.H. to be supervisory would vastly expand the reach of Code § 18.2-370.1. The purpose of the statute is "to protect minors from adults who might exploit certain types of relationships." Sadler, 276 Va. at 765,

---

[5] Under the doctrine of interpanel accord, "a decision of a panel of the Court of Appeals becomes a predicate for application of the doctrine of *stare decisis* until overruled by a decision of the Court of Appeals sitting *en banc* or by a decision of [the Supreme] Court." Johnson v. Commonwealth, 252 Va. 425, 430, 478 S.E.2d 539, 541 (1996). "This principle applies not merely to the literal holding of the case, but also to its *ratio decidendi*—the essential rationale in the case that determines the judgment." Clinchfield Coal Co. v. Reed, 40 Va. App. 69, 73-74, 577 S.E.2d 538, 540 (2003).

667 S.E.2d at 785. The broad definition of supervision urged upon us by the Commonwealth would transform the statute into one whose purpose is simply to protect minors from adults. While such a goal may be laudable, "[i]t is our duty to interpret the statute as written and when this is done our responsibility ceases." City of Lynchburg v. Suttenfield, 177 Va. 212, 221, 13 S.E.2d 323, 326 (1941). The Commonwealth's interpretation of Code § 18.2-370.1 would require us to depart from the meaning of the words of that statute. "To depart from the meaning expressed by the words in the statute is to alter it, resulting in legislation rather than interpretation." Floyd v. Fischer, 199 Va. 363, 366, 99 S.E.2d 612, 615 (1957). We may only interpret a statute as it is written, not as it might be written.

No matter how deferentially we view the facts here, they do not jibe with the precedent discussed above. Unlike in Krampen, no one entrusted B.H. to Hutton. Unlike in Guda, Hutton's job did not require that he protect and supervise B.H. Nor was Hutton fulfilling a traditional role of trust, such as the coach in Sadler. Hutton was not, in even the broadest sense of the word, a "babysitter," as was the case in Kolesnikoff. Even employing the looser "voluntary course of conduct" test from Snow, we cannot find that Hutton's actions demonstrated the necessary supervisory relationship with B.H. His course of conduct still involved no supervisory or caretaking behavior. He did not take responsibility for the safety or well-being of B.H. All of the cases cited above require some affirmative action establishing a supervisory relationship between an adult and a child. In some instances, an adult is explicitly entrusted with the safekeeping of a child, as in Krampen, while in other instances, an adult engages in a course of conduct consistent with supervision, as in Guda, Sadler, Kolesnikoff, and Snow. In none of the cases, however, does simply being in the presence of a child trigger a supervisory obligation.

- 11 -

Hutton did not exercise control over B.H. in any way uniquely related to her status as a minor. The aspect of Hutton's relationship with B.H. that most strongly shows control was the sexual activity into which Hutton pressured B.H.[6] However, we are aware of no precedent that would permit the Commonwealth to use the sexual proposals to prove a supervisory relationship. Furthermore, this sort of control was not deployed in furtherance of "the victim's safety and well-being." Krampen, 29 Va. App. at 168, 510 S.E.2d at 278. Hutton's instructions to B.H. to leave his home were no different from a request that any property owner or occupant is free to make of a guest. Passing telephone messages to B.H., similarly, does not transform Hutton's relationship with B.H. into a "supervisory" or caretaking one. It was an ordinary courtesy that any homeowner would perform for a guest, adult or child. The Commonwealth points to the fact that Hutton and his mother served B.H. food. An act of hospitality does not become an act of supervision merely because the recipient of the food is a minor. Here, B.H.'s age is relevant. The same acts that, if taken on behalf of a young child, might indicate a supervisory relationship mean something different when taken on behalf of an older child. Feeding a five year old and passing that child a phone message might show supervision, while sharing a meal with a teenager and passing her a message do not. We accept as true Rhonda's testimony that Hutton told her that he was a "mentor" to B.H. No testimony of B.H. or any other witness shows that he actually filled this role, however. While we accept as a fact that Hutton called himself a "mentor," no evidence shows that he acted in accordance with this statement.

In prior cases, the argument that an adult was in a supervisory relationship with a child was strengthened when that adult was the only adult present with the child. See, e.g., Snow, 33 Va. App. at 773, 537 S.E.2d at 10 (observing that, "[a]s the only adult present during these trips,

_____

[6] B.H. testified about the circumstances surrounding Hutton's requests for sex: "After he kept on asking me, I would keep on saying no, and then he would keep on asking me and I finally just gave in."

[Krampen] had the responsibility for and control of the victim's safety and well-being." (quoting Krampen, 29 Va. App. at 168, 510 S.E.2d at 278)). The Attorney General suggests that we can infer that Hutton was the only adult present and was thus responsible for the care of the child. The evidence presented at trial does not support this inference. Often, Hutton's mother was present in the home as well. To the extent the Attorney General was trying to make the more limited point that Hutton was the only adult in the home during the five instances when Hutton and B.H. had sex, this argument lacks support as well. The record is silent as to the presence or absence of any other adults in the home on any of those five occasions. Although "[i]t is our duty to discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom," Wright v. Commonwealth, 196 Va. 132, 137, 82 S.E.2d 603, 606 (1954), there was no evidence one way or another about precisely who was at home when Hutton and B.H. had sex. (Nor does the fact that they had sex give rise to an inference that the house was otherwise empty.) The most we can reasonably infer is that, at the time Hutton had sex with B.H., the two of them were alone *in the room* in which they had sex.

### III.

Based upon our review of both the statute and precedent from this Court and the Supreme Court, we hold that the trial court erred when it found that Hutton maintained the "supervisory relationship" with B.H. required for a violation of Code § 18.2-370.1(A). As such, we reverse Hutton's conviction and remand for further proceedings consistent with this opinion if the Commonwealth be so inclined.

Reversed and remanded.