COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Huff and AtLee

HUMBERTO AJANEL-SANIC

MEMORANDUM OPINION*
v.      Record No. 0445-22-4                          PER CURIAM
                                                      SEPTEMBER 27, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

(Mark S. Thrash, on brief), for appellant. Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Lindsay M. Brooker, Assistant Attorney General, on brief), for appellee.


A jury convicted Humberto Ajanel-Sanic of aggravated sexual battery and forcible sodomy of a child under the age of thirteen. On appeal, he argues that the trial court abused its discretion by imposing a life sentence on the forcible sodomy conviction because his background, the circumstances of the offense, the presentence investigation, and the discretionary sentencing guidelines "dictated a lesser sentence."[1] After examining the briefs and record in this case, the panel unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a). The trial court's judgment is affirmed.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Ajanel-Sanic does not challenge his aggravated sexual battery conviction or sentence. Ajanel-Sanic was also charged with rape and object sexual penetration, but the jury did not reach verdicts on those charges.

UNPUBLISHED

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

In 2016, L.V. lived with her parents, two of her siblings, and Ajanel-Sanic—her mother's cousin. When L.V. was six years old, Ajanel-Sanic began sexually abusing her. Ajanel-Sanic kissed L.V. using his tongue at every opportunity and forced L.V. to touch his penis. He also "touched" his penis to L.V.'s vagina "[a] lot of times," causing her pain afterward. Ajanel-Sanic also put his penis in L.V.'s mouth "[e]very time." L.V. saw "[a] white thing" come from Ajanel-Sanic's penis "[a] lot of times" during the abuse. Afterwards, Ajanel-Sanic "wiped his penis" with "a piece of paper." The abuse usually occurred in the living room or Ajanel-Sanic's bedroom. If other family members were present, Ajanel-Sanic told them "to leave."

When L.V. was ten years old, she told her mother, Amada Gonzalez, that Ajanel-Sanic had "touched her vagina" and "rubbed his penis on her vagina." When Gonzalez confronted Ajanel-Sanic, he denied the allegations. Nevertheless, he moved away from the home. Sometime later, Ajanel-Sanic called Gonzalez and asked her forgiveness.

After the family reported the abuse to police, L.V. was interviewed by a forensic interviewer, Marcella Rustioni, with the Arlington Child Advocacy Center. Before the recorded interview, Rustioni informed L.V. of the "importance" of being truthful. L.V. understood and stated that when she was "alone" with Ajanel-Sanic, he "touch[ed]" her and did "things that he wasn't supposed to." L.V. stated that he "kiss[ed]" her mouth "and his private part" touched

hers "whenever he had the chance." Once, Ajanel-Sanic's "private part" touched hers while they were in the attic and Gonzalez was in the kitchen. L.V. stated that the abuse continued until Gonzalez "found out."

In August 2020, Detective Echenique interviewed Ajanel-Sanic about L.V.'s allegations at the police station. As an "interview tactic," Detective Echenique falsely told Ajanel-Sanic that police had found his DNA in L.V.'s vagina and on other parts of her body. Ajanel-Sanic then stated that L.V. often came "to him wanting to do things with him" and "trying to touch him." He "eventually" began "touching [her] vagina" with his penis. He also put his penis in her mouth "on numerous occasions." Ajanel-Sanic stated that L.V. "reach[ed]" inside his pants and "masturbate[d] him" "between two and four times." He insisted that L.V. initiated the sexual contact, asking him to "put it in" her, but he only inserted the "tip of his penis into [her] vagina" to keep from hurting her. At the end of the interview, Ajanel-Sanic stated that he "felt bad" and "cried practically every day."

A grand jury indicted Ajanel-Sanic for aggravated sexual battery and forcible sodomy of a child under the age of thirteen. At the jury trial, Ashleigh Daniel, a sexual assault nurse examiner, testified for Ajanel-Sanic. During an examination of L.V. on August 8, 2020, Daniel did not find anything abnormal in her physical or genital examination. L.V. had an "estrogenized hymen" with a "notch," which Daniel described as "normal" findings for L.V.'s age and development. Daniel agreed that "an intact hymen is not an indicator of whether . . . a patient suffered sexual intercourse" and that "women have actually given birth while their hymen is still intact."

The jury convicted Ajanel-Sanic of aggravated sexual battery and forcible sodomy of a child under the age of thirteen. The court continued the case for sentencing and ordered a presentence investigation report.

In the presence report, Ajanel-Sanic again insisted that L.V. initiated the sexual contact and ignored his demands that she leave. He claimed that he "never wanted to touch her because it was 'wrong.'" Moreover, he claimed that he was "the biggest loser in the case" because he "lost everything," including his family.

Ajanel-Sanic also reported that, when he was five years old, his father had been murdered in Guatemala. He grew up "in poverty" and without stable housing. His stepfather was a "violent man who physically abused his mother." Accordingly, he left his home when he was eight years old, "lived on the street," and moved to Mexico when he was nine.

The investigating probation officer recommended that the trial court impose a "lengthy period of supervised probation," require a substance abuse evaluation, and order a "sex offender evaluation with completion of any related treatment." She further recommended that Ajanel-Sanic have no unsupervised contact with minors.

At the sentencing hearing, Gonzales testified that she had loved Ajanel-Sanic "like a brother[,] but now he's a despicable being." Gonzales asserted that Ajanel-Sanic destroyed L.V.'s life and did not know the "pain" he caused. In a victim impact statement, L.V.'s father expressed his anguish and fury over the pain Ajanel-Sanic had inflicted on the entire family. He asked the trial court to impose "the maximum sentence" available.

Ajanel-Sanic asked the trial court to impose a sentence within the discretionary sentencing guidelines.[2] He emphasized his lack of a criminal record and asserted that he had "become anathema" in society. He also noted his remorse, as demonstrated by his statements to

---

[2] The discretionary sentencing guidelines recommended between seven years and six months' incarceration and twenty-four years and three months' incarceration, with a midpoint of thirteen years and six months. The high end of the guidelines was adjusted up based on Ajanel-Sanic's score on the "risk assessment."

Detective Echenique. He acknowledged that the case involved "a great deal of pain" and asserted that the guidelines considered that circumstance.

In response, the Commonwealth asked the trial court to impose a sentence significantly above the high end of the discretionary sentencing guidelines and emphasized that the sexual abused occurred "from the time [L.V.] was six years old to the time she was ten years old," whenever they were alone. Notwithstanding the single sodomy charge, the evidence established that Ajanel-Sanic had engaged in an extended pattern of abuse. Moreover, Ajanel-Sanic took "no responsibility" for his actions; instead, he "blame[d] the child explicitly." The Commonwealth concluded that this was "one of the most severe" cases of sexual abuse and that the guidelines were not "near appropriate."

In allocution, Ajanel-Sanic stated that he was "very sorry for everything that happened." He wanted to "go back to [the] past" to "avoid" everything. He lamented that he had left his "daughter alone" and lost his family. Reiterating his apology, Ajanel-Sanic stated that he had "no idea how all of this could have happened."

The trial court found that Ajanel-Sanic had no remorse or insight into his offenses. Rather, he was "basically saying that [L.V.] came to him and asked him to sexually assault her, including kissing him and touching his own private areas." It found that Ajanel-Sanic had "preyed upon the kindnesses and trust of a family and abused that trust to gain access to a little girl for his own personal gratification" when she was very young. Given Ajanel-Sanic's lack of remorse, the trial court found that there was no "assurance" that he would not prey on "other children" after his release. Accordingly, it sentenced Ajanel-Sanic to life imprisonment. Ajanel-Sanic appeals.

ANALYSIS

Ajanel-Sanic argues that the trial court abused its sentencing discretion by imposing a life sentence because his background, the circumstances of the offense, the presentence report, and the sentencing guidelines "dictated a lesser sentence." He contends that the trial court's sentence rested on the erroneous conclusion that there was no "assurance" that Ajanel-Sanic would not abuse other children if released. He maintains that such a concern exists "in every case of a sex offense" and the probation officer's recommendations for post-release supervision adequately addressed that concern. Moreover, Ajanel-Sanic explains his repeated claims that L.V. initiated the sexual contact as the result of his "wholly uneducated . . . life on the streets of Guatemala and Mexico." He maintains that such a background is "not conducive to a mature, circumspect view of the world." We find no abuse of the trial court's discretion.

At the threshold, we note that the sentencing guidelines did not dictate any sentence. "The sentencing guidelines are advisory only and do not require trial courts to impose specific sentences." *Runyon v. Commonwealth*, 29 Va. App. 573, 577-78 (1999). Accordingly, a judge's failure to follow the sentencing guidelines shall "not be reviewable on appeal or the basis of any other post-conviction relief." Code § 19.2-298.01(F). Instead, "[w]e review the trial court's sentence for abuse of discretion." *Scott v. Commonwealth*, 58 Va. App. 35, 46 (2011).

"[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason v.*

- 6 -

*Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565). Here, Ajanel-Sanic's sentence was within the range set by the legislature. Code § 18.2-67.1(B).[3]

It was within the trial court's purview to weigh the mitigating evidence Ajanel-Sanic presented, including his difficult childhood. *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000). "Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du*, 292 Va. at 563. "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.*

The record demonstrates that the trial court considered Ajanel-Sanic's childhood and background as recounted in the presentence report. The court also considered the probation officer's recommendations for post-release supervision. Balanced against those circumstances, however, was Ajanel-Sanic's repeated and egregious sexual abuse of L.V. when she was so young. Moreover, Ajanel-Sanic refused to accept responsibility for his offenses, instead steadfastly insisting that L.V. had initiated the sexual contact. Given Ajanel-Sanic's lack of remorse and refusal to accept responsibility, the record fairly "supports the trial court's" conclusion that there was no "assurance" that Ajanel-Sanic would not reoffend. *Id.* at 566.

In explaining its departure from the sentencing guidelines, the trial court wrote: "[Ajanel-Sanic] stated that the CHILD . . . was the instigator of these sexual assaults" and "the events took place 'any chance he got' for 4 years." After considering all the circumstances, the

---

[3] Had the Commonwealth alleged in the forcible sodomy indictment that Ajanel-Sanic was eighteen years or older when he sodomized L.V.—which he was—the trial court would have been compelled to impose a mandatory life sentence. *See* Code § 18.2-67.1(B)(2) (providing that when a defendant commits forcible sodomy against a victim less than thirteen years old, and "it is alleged in the indictment that the offender was 18 years of age or older at the time of the offense, the punishment shall include a mandatory minimum term of confinement for life").

trial court imposed the sentence that it deemed appropriate. That sentence "does not exceed [the statutory] maximum," and our task is complete. *Id.* at 564; *see also Thomason*, 69 Va. App. at 99 ("Appellant's sentence was within the statutory range, and our task is complete.").[4]

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*

---

[4] To the extent Ajanel-Sanic argues that we should overrule *Minh Duy Du*, we must reject his argument. "'[W]e are bound by decisions of the Supreme Court of Virginia and are without authority to overrule' them." *Vay v. Commonwealth*, 67 Va. App. 236, 258 n.6 (2017) (quoting *Roane v. Roane*, 12 Va. App. 989, 993 (1991)). "This principle applies not merely to the literal holding of the case, but also to its *ratio decidendi*—the essential rationale in the case that determines the judgment." *Hutton v. Commonwealth*, 66 Va. App. 714, 724 n.5 (2016) (quoting *Clinchfield Coal Co. v. Reed*, 40 Va. App. 69, 73-74 (2003)).