COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Humphreys, Huff and AtLee
Argued at Leesburg, Virginia


FRANCISCO JAVIER SARAVIA

                                                         MEMORANDUM OPINION* BY
v.        Record No. 0318-22-4                      JUDGE GLEN A. HUFF
                                                              JANUARY 31, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CULPEPER COUNTY
Dale B. Durrer, Judge

Daniel A. Harvill (Daniel A. Harvill, PLLC, on briefs), for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Francisco Saravia was convicted of custodial indecent liberties, in

violation of Code § 18.2-370.1.  On appeal, Saravia asserts that the evidence failed to prove he

maintained a custodial or supervisory relationship with the victim.  For the following reasons, this

Court affirms the judgment of the trial court.

BACKGROUND[1]

In December 2019, N.A.[2] was sixteen years old and a junior in high school.  She lived with

her mother and three siblings in a two-story, three-bedroom house.  Saravia was engaged to N.A.'s

mother and had moved into the house in October or November 2019.  N.A. considered Saravia a

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] "Under well-settled principles of appellate review, we consider the evidence presented
at trial in the light most favorable to the Commonwealth, the prevailing party in the circuit
court."  *Porter v. Commonwealth*, 276 Va. 203, 215-16 (2008).

[2] This Court uses the victim's initials to maintain her privacy.

"new potential dad" and was happy to have him in her life as a father figure. N.A., her siblings, her mother, and Saravia did things together "as a family." For example, on the weekends they would go to the mall or Walmart together and "just drive around" together. The family ate meals and watched television together, and Saravia regularly took N.A. and her siblings shopping. Saravia also made repairs around the house. At times, N.A. and Saravia spent time together "one-on-one."

On the evening of December 11, 2019, Saravia and N.A. sat alone on the couch watching television. The rest of the family was upstairs. Saravia put his arm around N.A. and began to massage her shoulders. He then grabbed her breasts. N.A. "didn't know how to react, so [she] just let it happen." Saravia kissed N.A., and then he lifted N.A.'s shirt, rolled down her bra until her breasts were exposed, and began to suck on her breasts. N.A. felt betrayed and disgusted. She froze and did nothing because she was scared and shocked. Saravia then sat back on the couch and made himself "comfortable," as he grabbed N.A.'s hand and put it on his penis. Saravia made N.A. massage his penis as he pulled down his pants and exposed himself. N.A. noticed that Saravia was uncircumcised and had recently shaved. Saravia pushed N.A.'s head down toward his penis so she would perform oral sex on him. Saravia then stood up and made her perform oral sex on him from that position. Saravia asked N.A. in Spanish if she liked it. N.A. did not respond.

Saravia went to the bathroom to wash his hands, while N.A. sat on the couch and "process[ed] what just happened." When N.A.'s mother returned downstairs, Saravia sat at the dining room table and pretended nothing happened, while N.A. went upstairs and brushed her teeth "three or five times" to remove the taste from her mouth. N.A. then took an hour-long shower. N.A. told her best friend about the incident the next day at school, and she reported it to her mother the next evening. N.A.'s friend reported the incident to her own mother, who called the police.

Culpeper Police Detective Austin McNabb investigated the case. Detective McNabb interviewed Saravia two days after the incident. Saravia denied that anything sexual occurred

between himself and N.A., but he admitted his penis is uncircumcised and he told McNabb he had recently shaved his pubic area. Saravia denied that N.A. had ever seen him naked.

Saravia was indicted in February 2020, and his trial took place in November 2021. After the Commonwealth rested its case, Saravia made a motion to strike, arguing there was no evidence he was in a custodial or supervisory relationship with N.A. The trial court denied the motion.

Next, the defense called N.A.'s mother, Ena Campos. She testified that Saravia moved in with her in October 2019. While he was her fiancé at the time, they had since married. Campos remembered that on the night of the offense, the family ate dinner together and then she went upstairs for about ten minutes. When she returned, N.A. and Saravia were on the couch watching television. She did not notice anything unusual.

Saravia testified in his defense. He claimed that he was alone on the couch with N.A. for between five and ten minutes, but that no touching occurred between them, and he further denied that his penis was ever exposed. He also testified that after N.A. took a shower on the night of the offense, she came back downstairs and he noticed that her mood had changed from happy to "serious."

The jury returned a guilty verdict. Thereafter, Saravia moved to set aside the verdict, again arguing that the evidence failed to prove a custodial or supervisory relationship between N.A. and Saravia. The trial court denied the motion. This appeal followed.

ANALYSIS

Saravia assigns two errors: that the evidence was insufficient, and therefore the trial court erred in (1) refusing to grant his motion to strike and (2) refusing to grant his motion to set aside the verdict. But appellant never renewed his motion to strike after presenting his own evidence—and thus essentially waived his first assignment of error as to his motion to strike. *Murillo-Rodriguez v.*

*Commonwealth*, 279 Va. 64, 83-84 (2010). Accordingly, this Court addresses only his second assignment of error regarding the motion to set aside the verdict.

Saravia claims that the evidence failed to prove he maintained a custodial or supervisory relationship with N.A. This Court disagrees.

Code § 18.2-370.1[3] provides in pertinent part:

> Any person 18 years of age or older who . . . maintains a custodial or supervisory relationship over a child under the age of 18 and is not legally married to such child and such child is not emancipated who, with lascivious intent, knowingly and intentionally (i) proposes that any such child feel or fondle the sexual or genital parts of such person . . . (ii) proposes to such child the performance of an act of . . . fellatio . . . or (iii) exposes his or her sexual or genital parts to such child . . . is guilty of a Class 6 felony.

Because the statute aims "to protect minors from sexual exploitation by adults who hold positions of trust or authority with regard to them," it "requires proof of a 'custodial or supervisory relationship' as a 'predicate to finding guilt.'" *Sadler v. Commonwealth*, 51 Va. App. 17, 22, 25 (2007) (quoting *Seibert v. Commonwealth*, 22 Va. App. 40, 46 (1996)), *aff'd*, 276 Va. 762 (2008).

"In interpreting Code § 18.2-370.1, the Virginia Courts have broadly construed the meaning of custody, going beyond legal custody, to include those with informal, temporary custody." *Guda v. Commonwealth*, 42 Va. App. 453, 458 (2004). Accordingly—and contrary to Saravia's argument—the statute "does not require the specific entrustment of the child to the care of the adult to create a custodial or supervisory relationship." *Id.* at 459. Instead, a factfinder must look at all the circumstances of the relationship to determine whether "the supervising adult exercises care and control over the child, . . . including the 'responsibility for and the control of the child's safety and well-being.'" *Id.* (quoting *Krampen v. Commonwealth*, 29 Va. App. 163, 168 (1999)). In fact, a person "may become a person responsible for the care of a child by a voluntary course of conduct

---

[3] Saravia assigns error only to the trial court's finding that a supervisory or custodial relationship existed between himself and N.A.

and without explicit parental delegation of supervisory responsibility." *Id.* at 460 (quoting *Snow v. Commonwealth*, 33 Va. App. 766, 773 (2000)).

"Whether such a relationship exists at the time of the offending conduct is a matter of fact to be determined on a case-by-case basis." *Sadler v. Commonwealth*, 276 Va. 762, 765 (2008). The factfinder's resolution of conflicting facts, as well as competing inferences, deserves "the highest degree of appellate deference." *Thomas v. Commonwealth*, 48 Va. App. 605, 608 (2006). "'If there is evidence to support the conviction,' we will not substitute our judgment for that of the trier of fact, even were our opinion to differ." *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002) (quoting *Commonwealth v. Presley*, 256 Va. 465, 466 (1998)).

The facts here established the required custodial relationship. Saravia—Campos's then-fiancé—had moved in with Campos, N.A., and N.A.'s siblings. He felt such a responsibility to the household that he maintained the property and conducted repairs on the house. Saravia, Campos, and the children treated each other as family; they prepared and ate meals together and participated in family activities together. Saravia even took N.A. and her siblings shopping for necessities and gifts, and he tried to establish a close relationship with the children. Indeed, N.A. saw Saravia as a new father figure entering her life, and the two spent one-on-one time together.

A reasonable factfinder could conclude from those circumstances that Saravia engaged in a voluntary course of conduct that created a supervisory or custodial relationship with N.A., even without Campos's "explicit parental delegation of supervisory responsibility." *See Guda*, 42 Va. App. at 460. As Campos's live-in fiancé and N.A.'s potential new father figure, Saravia's responsibility for N.A.'s safety and well-being constituted the type of supervisory relationship required by Code § 18.2-370.1.

In his insistence that no supervisory relationship existed, Saravia relies on *Hutton v. Commonwealth*, 66 Va. App. 714 (2016). But Saravia had a much closer relationship with N.A.

than Hutton did with his victim. Hutton lived in a separate house across the street from the victim's family, and the victim's mother specifically warned the victim not to go to Hutton's house because she "did not need to be hanging out with a grown man." *Id.* at 716-17. Thus, Hutton was not entrusted with his victim's care, either by way of his employment or by the victim's mother. Instead, the victim visited Hutton's house as a neighbor and friend. In this case, Saravia lived in the same house as N.A. and accepted a father-like role in her life. He had parental permission to drive N.A. and her siblings to various places and did things alone with N.A. Therefore, unlike in *Hutton*, Saravia used his burgeoning, live-in relationship with the family and his time alone with N.A. to assault her with his unwanted sexual advances, the very scenario prohibited by the statute. *See Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) ("The purpose of the statute 'is to protect minors from adults who might exploit certain types of relationships.'" (quoting *Sadler*, 276 Va. at 765)). *Hutton*, therefore, does not control here.

The trial court found as a matter of fact that Saravia exercised the requisite care and control over N.A. Because the record supports that finding, this Court will not disturb it on appeal.

CONCLUSION

For the foregoing reasons, this Court affirms Saravia's conviction for taking custodial indecent liberties with a minor.

*Affirmed.*