COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, O'Brien and Athey
Argued at Norfolk, Virginia

DANIEL JUSTIN ROSE

                                             MEMORANDUM OPINION[*] BY
v.       Record No. 0893-23-1              JUDGE CLIFFORD L. ATHEY, JR.
                                                JULY 23, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Stephen C. Mahan, Judge

David M. Good (David Michael Good, P.C., on brief), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Daniel Justin Rose ("Rose") was convicted of forcible sodomy of a child under the age of

13, object sexual penetration of a child under the age of 13, aggravated sexual battery of a child

under the age of 13, and indecent liberties with a minor following a 3-day jury trial in the Circuit

Court of the City of Virginia Beach ("trial court") that began on December 5, 2023. The trial court

imposed 2 life sentences plus 25 years with 25 years of incarceration suspended. On appeal, Rose

assigns error to the trial court for: 1) permitting the Commonwealth to introduce a recorded

interview with the alleged victim; 2) failing to find the alleged victim's testimony inherently

incredible and thus insufficient to support his convictions; and 3) failing to grant Rose's motion

wherein he contends that requiring mandatory life sentences for convictions for forcible sodomy

and object sexual penetration are unconstitutional. Finding no error, we affirm the trial court's

judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

## I. BACKGROUND[1]

Robin Tillotson ("Tillotson") was "dating" Josh Yarborough ("Yarborough"). They lived in a trailer owned by Dennis Matthew White ("White"). White and Rose also resided in the trailer. Tillotson is the mother of four children, including ten-year-old O.L. and seven-year-old A.T. On March 15, 2021, Tillotson and Yarborough, accompanied by O.L. and A.T., drove to a local bank and then to the trailer. They "hung out" with Rose in the trailer's living room, which was furnished with two couches and a television. White, who was ill, stayed "in his back room." Tillotson and Yarborough subsequently wanted to "go to Walmart," whereupon Rose volunteered to remain at the trailer to supervise O.L. and A.T. Although Tillotson was "hesitant," she eventually agreed to leave her children at the trailer with Rose because she would only be gone briefly and Yarborough assured her that the children would be "okay" staying with Rose.

At trial, O.L. testified that after her mother left and White returned to his bedroom, she began coloring on the "tiny" living room couch while A.T. played with his tablet on the larger couch. She further testified that Rose sat down behind her on the tiny couch and subsequently placed his hands under her clothing, touched her breasts, and began moving her breasts around in a circle. She also stated that Rose eventually put his hand inside of her leggings and rubbed and scratched her "butt hole" with his finger. Although she felt pressure, Rose's finger did not go "inside" her "butt hole." Rose then moved his hand "forward" and rubbed his fingers "outside

---

[1] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

and inside" of her vagina. She confirmed that during this episode she felt his fingers go "inside" her labia majora, but that they did not go "inside" her vagina. She explained that she did not respond to Rose's actions because she was "scared and didn't know what to do."

O.L. further explained that she eventually "jumped up," went to the bathroom, and "shut the door" to escape from Rose's advances. Although she did not recall how long she stayed in the bathroom, she did remember that when she came out, she sat on the larger couch away from Rose because she did not feel safe sitting next to him. However, she testified, Rose followed her to the couch, sat next to her, and "toss[ed]" a blue blanket over her head, initially preventing her brother who was nearby from witnessing the abuse. Rose then unbuttoned his pants revealing his penis and placed his hand behind her head before "shov[ing]" her head down into his lap. Rose then forced his penis inside of O.L.'s mouth, past her teeth. She could not remember if Rose lowered his pants or how many times he pushed her head "down."

O.L. then testified that "[t]o get him off" her, she bit Rose; Rose then moved her hand to his penis and began to move her hand "up and down" on his penis. O.L. did not remember "how many times [her] hand went up and down." A.T. also testified that he saw O.L. under a blanket near Rose with her head near Rose's leg. A.T. further testified that at some point Rose became aware that A.T. was watching them and he offered to pay A.T. $10 to look away.

Tillotson and Yarborough returned to the trailer from Walmart about an hour after they departed from the trailer. As soon as Rose heard the keys jingle in the door lock, he jolted upright, zipped his pants, and acted "like nothing [had] happened." Tillotson testified that upon entering the trailer she saw O.L. sitting next to Rose on the couch with a "terrified look on her face." After Yarborough thanked Rose for watching the children, Rose replied that White "had been in the home the entire time . . . watching the children." O.L. then "ran to the bathroom with tears in her eyes," and when Tillotson went into the bathroom to talk to her, O.L. was scared,

upset, and crying so much that she struggled to speak. Tillotson testified that she had "never seen her like [that] before." After she calmed down, O.L. told her mother what had happened. Yarborough also subsequently entered the bathroom "to make sure they were okay." As they talked inside the bathroom, Rose stood outside the bathroom door, eavesdropping, and asking them "what was wrong." Eventually, O.L. and her mother left the bathroom, gathered their belongings, and left with A.T. Tillotson explained that since it was after 10:00 p.m., and she was "shook[] up," she did not immediately call the police.

The next day, Tillotson did contact the police to report the abuse but did not mention "anything about oral sex." The police instructed Tillotson to take O.L. to a hospital for a forensic examination. That evening, Elizabeth Walters ("Walters"), a forensic nurse, examined O.L. who by the time of the examination had already urinated, showered, and changed her clothing. Walters's "head-to-toe" examination revealed that O.L. had "nonspecific generalized redness to her labia" but no acute injuries. Walters swabbed O.L.'s mouth, breasts, and anorectal and genital regions before submitting the swabs to the Virginia Department of Forensic Science for analysis. The forensic analysis revealed that male DNA was present in the non-sperm fraction of DNA in the mouth and breast swabs but that this DNA amount was too small to compare to Rose's DNA.

On March 18, 2021, Jessica Arrington ("Arrington"), a forensic interviewer employed by the Child Advocacy Center, conducted a video interview of O.L. which was recorded. Before starting the interview, Arrington assessed O.L.'s "developmental level," and confirmed that O.L. was willing to participate. Arrington chose to conduct the interview at a child-friendly "neutral location" with "minimal distractions" in a room that had a table with paper and markers for O.L. to color if she was comfortable with doing so. Arrington described O.L. as "calm" and able to "communicate effectively." O.L. told Arrington that her mother had brought her to the interview

because there was "an incident with somebody." O.L. then specified that this "somebody" was Rose, who had touched her in the "wrong way" while she was on the couch at White's trailer. She related that Rose began by "tickling [her] butt crack" but then "went deeper," moving his finger "under [her] underwear" and touching her "no-no square" and "butt." He "scratched" her "butt and no-no square" "harder and harder." O.L. explained that Rose's finger went "inside [her] no-no square" and it felt "rough up there." O.L. also told Arrington that while his hand was in her underwear, Rose moved his other hand under her bra and "rubb[ed]" her "boobs." She then "squeezed" away from Rose and went to the bathroom, but when she came back, Rose "started doing it again." Specifically, O.L. said that once she returned to the living room, Rose "put [her] under the covers and made [her] suck his" "no-no-square" and "play with it." She stated that his "no-no square" was "tall" with "blonde hairs," and he had exposed it through his jeans zipper. O.L. added that she knew that the incident happened "on a Monday" because her "mommy told [her]."

The grand jury subsequently indicted Rose for forcible sodomy of a child under the age of 13, object sexual penetration of a child under the age of 13, aggravated sexual battery of a child under the age of 13, and indecent liberties with a minor. Pretrial, the Commonwealth moved the court to permit the admission of Arrington's interview with O.L. pursuant to Code § 19.2-268.3. In support, the Commonwealth argued that O.L. had personal knowledge of the evidence, was mature enough to make truthful statements, and had "no reason to falsify or distort." Thus, the Commonwealth contended that the surrounding circumstances "provide[d] sufficient indicia of reliability" to exempt the recording from the rule against hearsay. Rose opposed the motion, arguing that O.L. had not made the statements from her personal knowledge because her mother told her "certain information," providing a "motive to fabricate." The trial court subsequently found that there were "sufficient indicia of reliability" to render O.L.'s statements "not

inadmissible hearsay" under Code § 19.2-268.3.[2]  Consistent with the pretrial ruling, the trial

court permitted the Commonwealth to introduce the recorded interview of O.L. into evidence

before playing the recorded interview for the jury.  In addition, O.L. testified concerning the

abuse and was cross-examined by Rose's counsel.  On cross-examination, O.L. only failed to

remember which couch she was on at the time of the alleged abuse and misstated the date of the

forensic examination.

After the Commonwealth rested its case, Rose testified in his own defense.  He began by

stating that he had planned to move out of the trailer he shared with Yarborough and White on

March 15, 2021, "but [Yarborough] had asked [him] to watch the kids so [he and Tillotson]

c[ould] go on [a] date the next day."  He also admitted that he watched O.L. and A.T. on the date

in question at Yarborough's request while Yarborough and Tillotson left to run an errand.  He

claimed that the three of them stayed in the living room while White stayed in his bedroom.  He

further testified that he and the children initially played with the dog and watched YouTube

videos.  He then started "boxing" with the dog, causing White to leave his room and tell them to

"keep it down" due to the noise.

Rose also claimed that O.L. and A.T. then started coloring in their coloring books and he

tried to help them by using his phone to show them "pictures of the pictures they were drawing

so they could have accurate coloring."  Rose then said that shortly after the children started

coloring, O.L. went to the bathroom, came back, grabbed the blue blanket, and tried "to put

[him] under it with her."  He stated that he pushed this blanket off and tried to get the children to

play the "quiet game."  Rose testified that at that time O.L. tried to lay her head down on his lap

and she bit his hand when he pushed her away.  He noted that this "bite" left a mark on his hand

that was present when he was later interviewed by the police.  Rose testified that after being

_____

[2] Judge James C. Lewis ruled on the Commonwealth's motion.

bitten by O.L., he spoke "sternly" to O.L., which made her "a little sad." When Tillotson and Yarborough returned, Rose confirmed that they both went into the bathroom with O.L. Once they left the bathroom, Rose said Tillotson prepared to leave with the children and Yarborough confronted Rose only on whether he had yelled at O.L. Finally, Rose denied sexually abusing O.L. or touching her inappropriately while Tillotson and Yarborough were gone.

Following the conclusion of all the evidence and closing argument by counsel, the jury convicted Rose of each of the alleged crimes. After a sentencing hearing, the trial court imposed two terms of life imprisonment, the mandatory minimum sentences for forcible sodomy and object sexual penetration of a child under the age of 13 under Code §§ 18.2-67.1(B)(2), 18.2-67.2(B)(2). The trial court also imposed 25 years of incarceration for the aggravated sexual battery and indecent liberties convictions, which the trial court suspended. Rose appealed.

## II. ANALYSIS

### A. *Standard of Review*

Initially, for purposes of our review, "[t]he admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020) (quoting *Amonett v. Commonwealth*, 70 Va. App. 1, 9 (2019)). We may only conclude that "an abuse of discretion has occurred" in cases in which "reasonable jurists could not differ" about the result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

Secondly, weighing, and balancing witness testimony "is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "The living record contains many guideposts to

the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them." *Stith v. Commonwealth*, 65 Va. App. 27, 35 (2015) (quoting *Williams v. Commonwealth*, 56 Va. App. 638, 642 (2010)). "Therefore, this Court will not disturb the fact finder's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Dalton*, 64 Va. App. at 526 (quoting *Walker v. Commonwealth*, 258 Va. 54, 71 (1999)). Lastly, we review challenges to a statute's constitutionality de novo. *Shin v. Commonwealth*, 294 Va. 517, 526 (2017).

B. *The trial court did not err in admitting O.L.'s out-of-court statements under Code § 19.2-268.3(B).*

First, Rose contends that the trial court erred by admitting the recording of O.L.'s forensic interview because it was inadmissible hearsay. In support, Rose contends that the trial court erred since O.L. was ten years old and provided answers to some of the questions asked by the forensic examiner based on what her mother had told her, which, in his opinion, gave O.L. a motive to falsify events. We disagree.

"As a general rule, hearsay evidence is incompetent and inadmissible." *Wilder v. Commonwealth*, 55 Va. App. 579, 587 (2010) (quoting *Caison v. Commonwealth*, 52 Va. App. 423, 431 (2008)). Nevertheless, in a case involving offenses such as those at issue here "[a]n out-of-court statement made by a child who is under 13 years of age at the time of trial or hearing who is the alleged victim . . . describing any act directed against the child relating to such alleged offense shall not be excluded as hearsay" if 1) "the court finds, in a hearing conducted prior to a trial, that the time, content, and totality of circumstances surrounding the statement provide sufficient indicia of reliability so as to render it inherently trustworthy," and 2) the child "testifies." Code § 19.2-268.3(B)(1)-(2).

When determining such trustworthiness, the court may consider, among other things, the following factors:

The child's personal knowledge of the event;

The age, maturity, and mental state of the child;

The credibility of the person testifying about the statement;

Any apparent motive the child may have to falsify or distort the event, including bias or coercion;

Whether the child was suffering pain or distress when making the statement; and

Whether extrinsic evidence exists to show the defendant's opportunity to commit the act.

Code § 19.2-268.3(B)(1)(a)-(f).

These factors "go beyond considering whether the child victim understands the duty to tell the truth . . . ; they look to other 'indicia of reliability' relating to the circumstances of the out-of-court disclosures." *Bista v. Commonwealth*, 78 Va. App. 391, 415 (2023) (en banc). No one factor or circumstance is dispositive. *Id.* at 416. Instead, the court must "take into account the totality of the circumstances surrounding the statement." *Id.* In reviewing the trial court's weighing of the statutory factors, we are bound by its findings of fact "unless [they are] 'plainly wrong or without evidence to support them.'" *Id*. at 417 (quoting *Park v. Commonwealth*, 74 Va. App. 635, 645 (2022)).

Here, based on the totality of the circumstances, we find that the out-of-court statements had sufficient trustworthiness to demonstrate the indicia of reliability needed to avoid being excluded by the rule against hearsay.[3] As a forensic interviewer, Arrington took several

---

[3] To note, Rose wrongly asserts that the trial court failed in performing its analysis by not considering certain relevant factors because it did not explicitly mention those factors in its findings. It is well established that "[a]bsent a statutory requirement to do so, 'a trial court is not required to give findings of fact and conclusions of law'" supporting its judgments. *Bowman v.*

precautions to "maintain the reliability of [O.L.'s] statement[s]." She asked broad, open-ended questions, avoided leading questions whenever possible, and conducted the interview in a child-friendly "neutral location" with "minimal distractions." O.L. never exhibited any pain or distress during the interview; instead, she was described as "calm." Arrington also observed that O.L. communicated "effectively," even though she was only ten years old, and recalled emphasizing to the child the importance of telling the truth and that she repeatedly reminded O.L. to "let [her] know" if she did not "understand something." And, importantly, Rose's own testimony showed he had the "opportunity" to commit the offenses thereby providing additional corroborative evidence in support of the reliability of O.L.'s testimony in the interview. *See* Code § 19.2-268.3(B)(1)(f).

Finally, Rose asserts that O.L. had a motive to lie to Arrington and answered her questions based on what her mother told her, not based on her personal knowledge. This assertion is unsupported by the record given that O.L. never qualified any of her statements *regarding the physical acts* undergirding the offenses with language such as "my mother told me." Instead, O.L.'s testimony was based entirely on her personal knowledge of the acts perpetrated against her. Although O.L. acknowledged that her mother had advised her of why she was there to talk to Arrington and what day of the week the offenses occurred on, these two isolated statements alone do not establish that O.L.'s statements during the interview were unreliable. Moreover, the only detail Tillotson contributed to O.L.'s allegations of sexual abuse was that she had told O.L. the day of the week upon which the offenses occurred, which has no bearing on the substance of O.L.'s allegations. Hence, the trial court did not abuse its discretion when it determined that O.L.'s out-of-court statements were admissible under Code

---

*Commonwealth*, 290 Va. 492, 500 n.8 (2015) (quoting *Fitzgerald v. Commonwealth*, 223 Va. 615, 627 (1982)). Thus, the trial court was not required to list each and every factor for its analysis to satisfy Code § 19.2-268.3(B)(1)-(2).

§ 19.2-268.3(B), as the record supports both the reliability and inherent trustworthiness of her statements. Thus, O.L.'s statements to Arrington, the forensic interviewer, were properly admitted in evidence and viewed by the jury.

C. *The record contains sufficient evidence to support Rose's convictions.*

Rose also contends that the evidence was insufficient to support any of his convictions because O.L.'s testimony was inherently incredible as a matter of law based on her inability to "remember the answer[s] to various questions." These assertions include: 1) that O.L. reported to Arrington that Rose forced her to perform oral sex, an allegation her mother neglected to include in her police report; 2) that O.L. failed to remember upon what date the forensic interview was conducted; and 3) that O.L. failed to identify which couch she was sitting on during the abuse. In reliance on these alleged inconsistencies in O.L.'s testimony, Rose asserts that O.L.'s testimony was inherently incredible and thus the evidence insufficient as a matter of law. We disagree.

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). And we have found that "[t]estimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* Hence, "[i]nconsistent statements by a witness only go to the weight and sufficiency of the testimony, not the competency of the witness." *Fordham v. Commonwealth*, 13 Va. App. 235, 240 (1991). And "[t]he credibility of the witnesses and the weight to be accorded their testimony lies *wholly within the purview of the jury*." *Id.* (emphasis added). Thus, any inconsistency in witness testimony is "'resolved by the fact finder,' not the appellate court." *Kelley*, 69 Va. App. at 626 (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)). Accordingly, we will not find witness testimony to be inherently incredible "unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects

- 11 -

or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Here, we find that Rose has failed to point to any statement made by O.L. that rendered the gravamen of her testimony manifestly false or so contrary to human experience that it is unworthy of belief.[4] *See e.g.*, *Hammer v. Commonwealth*, 74 Va. App. 225, 240 (2022). In fact, the record on appeal reflects that O.L. provided clear, unequivocal testimony regarding the essential elements of the offenses. Not only did O.L. testify that she was forced to perform oral sex, but the Commonwealth also produced evidence that corroborated her testimony in the form of her interview with Arrington, the statements made to Tillotson, and the eyewitness testimony of her brother, A.T. Tilloston's failure to include every detail of her daughter's allegations of sexual abuse against Rose in her report to the police does not render the otherwise overwhelming evidence of sexual abuse incredible as a matter of law. *Fordham*, 13 Va. App. at 240. Likewise, neither do portions of O.L.'s testimony where she could not remember certain secondary details about what transpired render the totality of the evidence incredible since such discrepancies are within the purview of the jury to decide. *See e.g.*, *Nobrega v. Commonwealth*, 271 Va. 508, 519 (2006) (holding that "inconsistencies" in the child's account of events "bear[] on the weight to be given her testimony" but do not render the testimony inherently incredible). Accordingly, we

---

[4] At oral argument and on brief, the Commonwealth asserted that Rose has waived this assignment of error under Rule 5A:18 as Rose made differing arguments on his motions to strike at trial. However, assuming without deciding that this assignment of error was preserved, we find Rose's assignment meritless.

conclude that based on the totality of the evidence adduced at trial, the testimony of O.L. was not inherently incredible as a matter of law. *Id.*[5]

Moreover, the balance of the Commonwealth's evidence at trial corroborated O.L.'s account. *See e.g.*, *Lambert v. Commonwealth*, 70 Va. App. 740, 760 (2019) (holding that a witness's testimony was not inherently incredible when it was corroborated by admissions and other evidence of conduct). For example, when Tillotson returned to the trailer minutes after the incident, she immediately noticed a "terrified look on [O.L.'s] face." She also noticed that O.L. was scared, upset, and crying so much that she struggled to speak. In fact, Tillotson said she had "never seen her like [that] before." *See Winfield v. Commonwealth*, 225 Va. 211, 221 (1983) (holding that a sexual assault victim's "distraught condition" shortly after the offense served to corroborate her testimony). In addition, A.T. corroborated much of O.L.'s testimony and even testified that Rose offered him $10 if he did not look at the abuse while O.L.'s head was being forced under the blanket. *Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) ("[I]t is universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, *concealment*, assumption of a false name, and *related conduct* are admissible as evidence of consciousness of guilt, and thus of guilt itself." (emphasis added)).

Finally, the forensic exam of O.L.'s body revealed "nonspecific generalized redness to her labia" and the presence of male DNA in her mouth and on her breasts. *See Ward v. Commonwealth*, 264 Va. 648, 653 (2002) (holding that a medical professional's testimony about a victim's "physical injuries tends to corroborate the victim's testimony" regarding the events in question). O.L. also shared with Arrington a detailed account of these offenses a mere three days

---

[5] To note, caselaw firmly establishes that convictions for "sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). The existence of other corroborative evidence in this case solidifies our conclusion that O.L.'s testimony was not inherently incredible as a matter of law. But such evidence is not necessary to sustain Rose's convictions.

after the alleged abuse, further corroborating her trial testimony regarding the essential elements of the offenses. Since this detailed prior consistent account of the alleged abuse was properly admitted under Code § 19.2-268.3(B)(1), O.L.'s prior statement effectively corroborated her testimony at trial, further bolstering the sufficiency of the evidence in support of the convictions.

In sum, "'there can be no relief' in this Court if a witness testifies to facts 'which, if true, are sufficient' to support the conviction '[i]f the trier of the facts bases its decision 'upon that testimony.'" *Kelley*, 69 Va. App. at 626-27 (alteration in original) (quoting *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010)). Here, O.L. competently testified to facts sufficient to support Rose's convictions, her testimony was substantially corroborated, and the jury based its verdicts on that testimony. Thus, O.L.'s testimony was not inherently incredible, and the evidence in support of Rose's convictions was sufficient.

> D. *The mandatory life imprisonment imposed by Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2) does not run afoul of the United States and Virginia Constitutions.*

Rose next asserts that Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2) unconstitutionally require mandatory life imprisonment for forcible sodomy and object sexual penetration when the victim is under 13 years old. In support of this contention, Rose argues that the statutes impose excessive, cruel, and unusual punishment and impermissibly delegate "judicial authority to the executive branch," violating the separation of powers doctrine. We address each in turn.

> 1. *Cheripka v. Commonwealth*, 78 Va. App. 480 (2023), bars Rose's argument that the mandatory life imprisonment imposed by Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2) constitutes "cruel and unusual punishment."

First, Rose argues in the face of established precedent that "the entire category of sentencing to a set term of mandatory life under" the challenged statutes "is unconstitutional." We disagree.

The Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Virginia Constitution protect against the infliction of "cruel and unusual punishments." Following years of interpretation, this right became concerned

with evaluating the "*mode* . . . [and] the *quantum* of punishments" as defined by the legislature, *Hart v. Commonwealth*, 131 Va. 726, 744 (1921), eventually recognizing a "'narrow proportionality principle' that 'applies to noncapital sentences,'" *Cheripka*, 78 Va. App. at 505 (quoting *Ewing v. California*, 538 U.S. 11, 20 (2003)). This principle proscribes "all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." *Harmelin v. Michigan*, 501 U.S. 957, 991 (1991) (quoting *Weems v. United States*, 217 U.S. 349, 371 (1910)). Applying this principle, it has become well-established that the Eighth Amendment provides "no support" to the contention that statutes imposing mandatory life imprisonment are unconstitutionally "cruel and unusual" when applied to adult criminal offenders. *Id.* at 994 (Scalia, J., concurring). "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Id.* at 994-95. Hence, "[t]here can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" *Id.* at 995.

Consistent with this precedent, the Supreme Court of Virginia "has [historically] deferred to legislative judgment concerning the quantum of punishment for offenses." *Dunaway v. Commonwealth*, 52 Va. App. 281, 311 (2008).[6] In doing so, we do not engage in a proportionality review in cases that do not involve life sentences without the possibility of parole. *See e.g.*, *Cheripka*, 78 Va. App. at 506 (declining to find a mandatory life sentence for a violation of Code § 18.2-67.2 to be unconstitutionally disproportionate because defendant was not sentenced to life

---

[6] At oral argument, Rose asserted that the United States Supreme Court's opinion in *Kennedy v. Louisiana*, 554 U.S. 407 (2008), supports his argument that his sentences in this case were disproportionate due to the nature of his offense, as the Court there found that a state death penalty statute for child rape was unconstitutionally disproportional because "[r]ape is without doubt deserving of serious punishment; but in terms of moral depravity and of the injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life." *Id.* at 427-28 (quoting *Coker v. Georgia*, 433 U.S. 584, 598(1977)). We disagree and find *Kennedy* inapplicable here as Rose is not facing capital punishment.

in prison without parole); *Cole v. Commonwealth*, 58 Va. App. 642, 654 (2011) ("We . . . agree that proportionality review 'is not available for any sentence less than life imprisonment without the possibility of parole.'" (quoting *United States v. Malloy*, 568 F.3d 166, 180 (4th Cir. 2009))). And we have found "the possibility of geriatric release under Code § 53.1-40.01 provides a meaningful opportunity for release that is akin to parole" when applied to violations of the object sexual penetration statute, Code § 18.2-67.2. *Cheripka*, 78 Va. App. at 506 (quoting *Johnson v. Commonwealth*, 292 Va. 772, 781 (2016)).

Importantly, under the interpanel-accord doctrine, where we have spoken through published opinion, the "decision . . . becomes a predicate for application of the doctrine of *stare decisis* until overruled by a decision of the Court of Appeals sitting *en banc* or by a decision of th[e] [Supreme] Court." *Brown v. Commonwealth*, 68 Va. App. 44, 51 n.1 (2017) (third alteration in original) (quoting *Johnson v. Commonwealth*, 252 Va. 425, 430 (1996)). This doctrine does not "merely [apply] to the literal holding of the case, but also to its *ratio decidendi—the essential rationale in the case that determines the judgment*." *Hutton v. Commonwealth*, 66 Va. App. 714, 724 n.5 (2016) (quoting *Clinchfield Coal Co. v. Reed*, 40 Va. App. 69, 73-74 (2003)).

Here, per the interpanel-accord doctrine, we find that our decision in *Cheripka*, its holding and ratio decidendi, bars Rose's arguments. To begin, we found in *Cheripka* that the mandatory life sentence imposed for object sexual penetration violations as proscribed by Code § 18.2-67.2 was not entitled to proportionality review on the grounds that the defendant would be eligible for geriatric release under Code § 53.1-40.01. 78 Va. App. at 506. As a result, the interpanel-accord doctrine prevents review of Rose's challenge to Code § 18.2-67.2 as his argument is directly in conflict with our holding in *Cheripka*, which we are barred from overruling here. Like object sexual penetration, forcible sodomy is not classified as a Class 1

felony. *See* Code § 18.2-67.1.  Hence, Rose will be likewise eligible for geriatric release under Code § 53.1-40.01.  Thence, as this eligibility was the crux of our decision to forgo a proportionality review in *Cheripka*, that opinion's ratio decidendi applies to Code § 18.2-67.1 with full force as "it is readily apparent that" Rose "was only sentenced to life in prison; he was not sentenced to life without parole." *Johnson*, 292 Va. at 781.  We therefore decline to conduct a proportionality review in this case in accordance with our precedent in *Cheripka*.

> 2. Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2) do not violate the separation of powers doctrine.

Lastly, Rose contends that the statutes imposing mandatory life imprisonment violate the separation of powers doctrine.  Emphasizing that the mandatory life provisions in Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2) apply only if the indictment alleges "that the offender was 18 years of age or older," Rose insists that the statutes afford the prosecutor the "sole discretion" to "mandate[] a sentence of life in prison."  As a result, he maintains that these statutes deprive the judiciary of its core function of "rendering judgment" and that it does so because he claims no court "can override the prosecutor's decision to seek a mandatory life sentence."  We disagree.

Prior precedent firmly establishes that the General Assembly may "define criminal punishments without giving the courts any sentencing discretion." *Lilly v. Commonwealth*, 50 Va. App. 173, 188 (2007) (quoting *Chapman v. United States*, 500 U.S. 453, 467 (1991)).  Indeed, "the development of mandatory minimum sentences reflects the traditional legislative role in creating statewide uniformity, at least at the lower end of the punishment scale, for all sentences for the specified crimes." *Id.*  Consequently, we have routinely rejected arguments that "mandatory minimum sentences" are "a legislative usurpation of a historically unique

- 17 -

judicial function." *Id.*; *see e.g., Johnson v. Commonwealth*, 56 Va. App. 244, 253 (2010)[7] (holding that a determinate sentence imposed for the defendant's violation of the proscription against violent felons possessing firearms did not constitute an unconstitutional usurpation of judicial power by the General Assembly). Thus, statutes prescribing mandatory determinate sentences do not violate the separation of powers doctrine. *Johnson*, 56 Va. App. at 253; *see Lilly*, 50 Va. App. at 184 ("'[S]pecification of punishments' [are] matters ordinarily understood as '*peculiarly questions of legislative policy*.'" (emphasis added) (quoting *Gray v. Commonwealth*, 274 Va. 290, 311 (2007))).

Rose does not argue against these well-settled principles. He does not argue that Code §§ 18.2-67(B)(2) and 18.2-67.2(B)(2) unconstitutionally abrogate judicial authority in favor of the legislative branch, but rather that they do so in favor of the executive branch. We find his argument unpersuasive.

Rose's argument misconstrues Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2). By enacting the statutes, the General Assembly exercised its right to impose a specific criminal punishment—life imprisonment—for forcible sodomy and object sexual penetration *only when* the victim was under 13 years old and the defendant was over 18 years old. Moreover, by requiring that a specific fact be alleged in the indictment before the mandatory sentence applies, the General Assembly ensures that a defendant received "notice of the nature and character of

---

[7] At oral argument, the Commonwealth invited this Court to find that under the interpanel-accord doctrine *Johnson v. Commonwealth* bars Rose's argument here on the grounds that we found in *Johnson* that determinate sentences did not unconstitutionally delegate judicial authority to the General Assembly, and that its "*ratio decidendi*" applies to sentencing authority delegations made to the executive branch. *Hutton*, 66 Va. App. at 724 n.5. As the legislative and executive branches are vested with distinct powers under the Virginia Constitution, we decline to find *Johnson* sufficiently analogous for the doctrine's application and analyze the constitutionality of this delegation on the merits. *See e.g.*, *Wayman v. Southard*, 23 U.S. 1, 46 (1825) ("The difference between the departments undoubtedly is, that the legislature makes, executive executes, and the judiciary interprets the law.").

the accusations against him" and possible consequences thereof. *Butler v. Commonwealth*, 64 Va. App. 7, 10 (2014).

Plainly, it follows that the General Assembly, not the executive branch, set the applicable penalties under Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2). The possibility that a prosecutor may proceed without including certain language in the indictment, and therefore without invoking the statutes' mandatory minimum sentencing provisions, does not mean that the prosecutor has set a defendant's punishment. To be sure, a prosecutor always has discretion to determine when and what charges "should be initiated in the first instance." *Moore v. Commonwealth*, 59 Va. App. 795, 811 (2012).[8]

As applied in the present case, the above principles grant the Commonwealth broad prosecutorial discretion to seek mandatory minimum life incarceration for offenses under Code §§ 18.2-67.1(B)(2) and 18.2-67.2(B)(2), solely based on how the offense is charged in the indictment. Occasionally, the Commonwealth may exercise its discretion to charge the defendant with an offense that provides for mandatory life incarceration upon conviction. It may do so, just as it may exercise its discretion to charge a lesser-included offense. In truth, a prosecutor, when the legislature has defined a required mandatory minimum, does not have the discretion to change that sentence any more than the trial court does. Rather, the prosecutor retains the discretion of charging the crimes he chooses to charge. And in making that judgment, the Commonwealth may be influenced by the relevant penalties that the General Assembly has established for each of the various offenses implicated in a case. Nevertheless, the choice of

---

[8] "It is well established that the choice of offenses for which a criminal defendant will be charged is within the discretion of the Commonwealth's Attorney." *In re Horan*, 271 Va. 258, 264 (2006) (quoting *Barrett v. Commonwealth*, 268 Va. 170, 178 (2004)). And "the institution of criminal charges, as well as their order and timing, are matters of prosecutorial discretion." *Id.* (quoting *Bradshaw v. Commonwealth*, 228 Va. 484, 492 (1984)). This is because "[a] prosecutor has the discretion to decide under which of several applicable statutes the charges shall be instituted." *Id.* (quoting *Hensley v. City of Norfolk*, 216 Va. 369, 373 (1975)).

when, what, and how to charge a defendant is neither the exercise of sentencing authority, nor a violation of the separation of powers doctrine. Thus, we find Rose's separation of powers challenge meritless.

### III. CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*